**AFFIDAVIT OF SPECIAL AGENT WILLIAM HUGHES IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT**

I, WILLIAM HUGHES, state:

**INTRODUCTION AND AGENT BACKGROUND**

1.      For the last eight years, I have been a Special Agent with the United States Food and Drug Administration, Office of Criminal Investigations ("FDA-OCI").  I am currently assigned to the Boston Resident Office.  I am responsible for investigating violations of the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 301 *et seq.,* and other federal statutes enforced by the FDA, and am empowered to conduct investigations, make arrests, and execute search and arrest warrants for these offenses.  Before that, I was a Special Agent with the Criminal Investigation Command, United States Army for over eleven years, and before that I was a Military Police Officer, United States Army for over nine years.

2.      In my law enforcement career, I have continually received training in criminal investigative techniques, and have completed numerous courses including the FDA-OCI Special Agent Training Program at the Federal Law Enforcement Training Center and the United States Army Criminal Investigations Special Agent Training Course.  I graduated from Campbell University in North Carolina with a degree in Criminal Justice.

3.      I submit this affidavit in support of an application for a warrant under 18 U.S.C. § 2703(a) and Rule 41 of the Federal Rules of Criminal Procedure to search and seize records and data from the email account identified as info@ycells.com ("the Target Account") (as described in Attachment A).

4.      I have probable cause to believe that this account contains evidence, fruits, and instrumentalities of the introduction of misbranded and unapproved new drugs into interstate commerce, in violation of 21 U.S.C. §§ 331(a) and (d); smuggling, in violation of 18 U.S.C.

§ 545; and conspiring to commit these offenses, in violation of 18 U.S.C. § 371 (together the "Subject Offenses"), as described in Attachment B.[1]

5.      This Court previously issued a search warrant for the target account on March 25, 2019.  19-MJ-6147-MPK (the "March 2019 Warrant").  The warranted requested in this application seeks records and data associated with the Target Account created after that date.

6.      The facts set forth in this affidavit are based on my personal observations and review of records, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## RELEVANT LAW

7.      Congress enacted the FDCA to protect the public from, among other things, drugs that are misbranded, unapproved, or otherwise unsafe.  The FDA enforces the FDCA, and its responsibilities include regulating the manufacturing, labeling and distribution of drugs shipped or received in interstate commerce.

8.      Under the FDCA, drugs are defined in relevant part as (1) articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of diseases in man, and (2) articles (other than food) intended to affect the structure or function of the human body.  21 U.S.C. § 321(g)(1)(B) and (C).

9.      Under the FDCA, a "new" drug is generally defined as one that is not generally recognized among qualified experts as safe and effective for use under the conditions prescribed, recommended, or suggested in its labeling.  21 U.S.C. § 321(p).

---

[1] On November 5, 2020, a grand jury returned an indictment charging Yalan TANG and Chenguang GONG with one count of conspiracy, in violation of 18 U.S.C. § 371, and twenty-one counts of introducing misbranded drugs into interstate commerce with intent to defraud and mislead in violation of 21 U.S.C. §§ 331(a) and 333(a)(2).

10.      It is a prohibited criminal act under the FDCA to introduce or deliver for introduction, or cause the introduction or delivery for introduction, into interstate commerce, any new drug that is not approved by the FDA for distribution in the United States.  21 U.S.C. §§ 331(d), 333(a) and 355(a).

11.      A drug is misbranded if it does not have labeling bearing adequate directions for use.  21 U.S.C. § 352(f)(1).  "Adequate directions for use" is defined by regulation as directions adequate for a layperson to use the drug safely and for the purpose for which it was intended.  21 C.F.R. § 201.5.  Among other things, directions for use may be inadequate because of the omission of statements of all the uses for which the drug is intended, quantity of dose, frequency of administration, and route or method of administration.

12.      A drug is also misbranded if its labeling is false or misleading in any particular way.  21 U.S.C. § 352(a).

13.      A drug is also misbranded if it was manufactured, prepared, compounded, or processed in an establishment not duly registered under 21 U.S.C. § 360.  21 U.S.C. § 352(o).

14.      It is a prohibited criminal act under the FDCA to introduce into interstate commerce a misbranded drug, or to receive in interstate commerce a misbranded drug and then deliver, or proffer delivery of, the misbranded drug to others.  21 U.S.C. §§ 331(a), 331(c), and 333(a).

15.      It is unlawful to fraudulently or knowingly import merchandise into the United States contrary to law or to knowingly receive, conceal, buy, or sell merchandise that has been imported contrary to law.  18 U.S.C. § 545.

**PROBABLE CAUSE TO BELIEVE THAT A FEDERAL CRIME WAS
COMMITTED AND THAT THE TARGET ACCOUNT CONTAINS EVIDENCE,
FRUITS, AND INSTRUMENTALITIES**

*First Customs and Border Protection Seizure and Initiation of the Ycells Investigation*

16.     On October 27, 2016, U.S. Customs and Border Protection ("CBP") seized a
FedEx package in New Orleans, LA, containing suspected Sildenafil Citrate.  Sildenafil Citrate is
the active ingredient in the FDA approved drug Viagra® and is used to treat erectile dysfunction.

17.     The package was addressed to Emily Decoung, 15 Main Street, Suite 292,
Watertown, MA 02472.  I determined that this address was a UPS Store and that Suite 292 was
rented to Yalan TANG, who listed her address on the UPS rental application as 54 Cummings
Park, Suite 320, Woburn, MA.

18.     The website of the Massachusetts Secretary of the Commonwealth, Corporations
Divisions listed TANG as the "Resident Agent" for Ycells LLC when it was organized as a
limited liability company under Massachusetts law on September 22, 2014.  The address for
Ycells was originally identified as 51 Regent Road, Malden, MA 02148.  The Certificate of
Organization for Ycells LLC was later updated replacing TANG as the Resident Agent and
changing the company address to 54 Cummings Park, Suite 320, Woburn, MA 01801.

19.     Through an open source internet search for Ycells LLC, I discovered the website
Ycells.com.  Although the content of the website was limited, it offered for sale customized
peptides, amino acids, and chemical derivatives.  The website listed 54 Cummings Park, Suite
320, Woburn, MA as the physical address for the company.  The website listed the email address
info@ycells.com and the phone numbers (855) 833-2949 and (617) 513-5528 as means to
contact the company.

20.     The Department of Homeland Security provided to me a list of shipments
imported to the United States and addressed to Ycells LLC, SLLECY (Ycells backwards) or to

UPS mailboxes rented by TANG or GONG.  Since December 2015, more than 500 packages have been shipped to these addresses.  Of those, at least 450 shipments were labeled "Peptides for Research Use Only."  Only a single one of these packages was sent to the Ycells business address at 54 Cummings Park, Suite 320, Woburn, MA.  The other packages were sent to ████, Belmont, MA (a single-family home), 464 Common Street, Suite 317, Belmont, MA (a UPS Store), and other residential addresses and UPS stores. ████████, Belmont, MA is the residential address listed on Yalan Tang's driver's license.

***Additional CBP Seizures***

21.     On January 23, 2018, CBP seized a package arriving through JFK International Airport, from China.  The package was addressed to "Heidi Syngenes," ████████, MA.  The package manifest identified the contents as "Hairdressing Cosmetics"; however, upon examination by CBP, the package contained a white powdery substance later identified by the FDA's Forensic Chemistry Center ("FCC") as Methasterone, a Schedule III steroid commonly used for body building purposes.

22.     On February 14, 2018, CBP seized a package arriving through the SFO Airmail Center, from China, destined for "Joe S. Ycells" at 1337 Massachusetts Avenue, Suite 272, Arlington, MA.  1337 Massachusetts Avenue, Arlington, MA is the location of a UPS Store. Suite 272 has been rented to Yalan TANG, who listed her address as ████████, Belmont, MA, since January 28, 2017.  The label of the package identified the contents as "Yarn" and identified the sender's address as Shandong, China.  Upon examination by CBP, the package weighed 1,010 grams and the contents were later identified by the FCC as Methoxydienone, a steroid commonly used for body building purposes.

23.     On December 31, 2019, CBP seized a package weighing approximately 10.5kg, shipped from China, addressed to "Sllecy" (Ycells spelled backwards), 15 Main Street, Suite

292, Watertown, MA 02472.  15 Main Street, Watertown, MA is the location of a UPS store. Suite 292 was rented to TANG.  The package manifest identified the contents as "Peptide (acyclic)" and the sender's address as Wuxi, China.  Upon examination, the package contained five hundred vials containing an unknown white powder labeled "G024-5"; five hundred vials containing an unknown white in color powder labeled "G036-2"; and one thousand vials of an unknown white powder labeled "G036-2."  FCC analysis identified confirmed the substances as peptides and provided evidence of the presence of growth hormones.

***Email Correspondence with Ycells LLC***

24.     On January 31, 2018, utilizing an undercover email account, I sent an email to the address info@ycells.com, requesting a list of products and prices.  Later that day, I received an email from info@ycells.com.  The email stated, *"Thank you for the inquiry. Yes, we provide all kinds of amino acids and derivatives. In the attachment please see the full list. Let me know if you have any question. Best, Wendy."*  Attached to the email was an Excel spread-sheet listing 1,884 different products, quantities and prices.  The products were all listed as chemical formulas; there were no common names associated with the formulas.

25.     On July 16, 2018, I sent an email addressed to "Wendy" at info@ycells.com requesting a price list with common names of products.  I received an email response requesting examples of the products I was looking for.  On July 23, 2018, I sent an email to info@ycells.com including a list of drugs.  The list included Tadalafil, Ostarine, Andarine, Winstrol, and Methyltest, which are all drugs commonly used for body building or to counteract the effects of steroid use.  I received an email response from info@ycells.com stating: *"I see what you are looking for. We should be able to provide some of them for research purposes. They are always in stock."*

*The California Investigation and Undercover Purchases of Illicit Steroids and Drugs*

26.     On July 16, 2018, I became aware of an OCI investigation in California concerning the purchase of steroids and drug products from Ycells.com and the resale of those products to human end users, mostly bodybuilders.  The case agent for that investigation informed me that the subjects were willing to assist in an investigation into Ycells.com.

27.     With assistance from the cooperating subjects of the California investigation, OCI created a fictitious company and website that purported to sell steroids.  Again with assistance from the cooperating subjects of the California investigation, we made contact with Ycells.com via an undercover email address associated with our fake website.

28.     On August 30, 2018, we sent an email utilizing an undercover address to info@ycells.com requesting a product pricelist.  Later that same day, an email was received from info@ycells.com that stated, "*Thank you for reaching us, we do carry chemicals and peptides for research purpose, we guarantee the highest quality.*"  Included in the email was a price list for peptides, steroids and drugs including Anastrozole, Clenbuterol, MK-677, Sildenafil and Tamoxifen, which are all drugs commonly used for body building or to counteract the effects of steroid use.

29.     On August 31, 2018, we responded to info@ycells.com requesting additional information regarding the products that they offered, asking in particular whether the company was based in the United States, what forms of payments were acceptable, and whether their chemicals were finished products.

30.     That same day, we received a response stating that Ycells was U.S-based and located in Boston, MA, that Ycells accepted credit card and wire transfers, and that peptides were ready to ship upon payment, while liquids were prepared upon order and could be shipped within two days following payment.

31.     Attached to the August 31, 2018 email was a purchase agreement form that we were asked to sign and return. The purchase agreement asked for verification that the products sold by Ycells would be used for research purposes only.

32.     We signed and returned this purchase agreement via email to info@ycells.com.

33.     From my training and experience, and discussions with other FDA agents familiar with this topic, I am aware that distributors of illegal drugs routinely attempt to avoid regulatory scrutiny by disguising their products as "research chemicals." This is because FDA regulations exempt chemicals used in prescription drugs from the requirement that their labeling contain adequate directions for use, provided that the products are shipped or sold to persons engaged in research and are to be used only for this purpose. 21 C.F.R. § 201.125.

34.     On September 12, 2018, we sent an email order from our undercover account for the purchase of steroids and other drugs to Ycells LLC's email address at info@ycells.com. The purchase order consisted of twenty 30ml vials of Clenbuterol, ten 30ml vials of GW501516, ten 30ml vials of MK-2866/Ostarine, twenty 30ml vials of Raloxifene, twenty 30ml vials of Tamoxifen, twenty 30ml vials of Tadalafil, and twenty 30ml vials of Sildenafil. All of these drugs are commonly used for bodybuilding or to counteract the effects of steroid use. The purchase utilized an undercover credit card for payment, and the total cost of the purchase was $845.00 for the product and $20.00 for shipping. The product was to be shipped to an undercover P.O. Box in Winchester, VA.

35.     Later that day, September 12, 2018, a response was received from info@ycells.com confirming the order and providing a written quote.

36.     On September 18, 2018, FDA Special Agent Eric Flagg received a package shipped by Ycells LLC to the undercover P.O. Box in Winchester, VA. SA Flagg shipped the

package unopened to me and I collected the contents as evidence. The box contained six smaller boxes, each of which was labeled "For Research Use Only" and "Not for Human Consumption." Each box contained 30ml blue vials topped with an eye dropper cap. The vials had the following labels: Raloxifene; Tamoxifen; Sildenafil; Tadalafil; Clenbuterol; GW501516; and MK-2866/Ostarine. The package did not contain labeling with directions for use for any of the drugs. Testing conducted by the FCC determined that the vials contained the drugs identified on the labels.

37. On April 12, 2019, samples of the contents of the undercover purchase were transferred to the USPIS to be evaluated for latent prints. On December 2, 2019, the Forensic Laboratory Services, United States Postal Service provided their report indicating latent prints belonging to Chenguang GONG were found on portions of the plastic sealing on the blue vials labeled "Sildenafil," on the adhesive side of the white label marked "MK-2866," and on the adhesive side of the "Ycells" tape removed from the exterior of the shipping box.

***Second Undercover Purchase of Illicit Drugs***

38. On October 17, 2018, we received an email at our undercover account from "Wendy" at the info@ycells.com email address. The email stated, *"Haven't heard you since the last order about a month ago. Just want to check in with you to see how you feel about our product. Let me know if you have any question."*

39. On October 22, 2018, we sent another email order from our undercover account for the purchase of steroids and other drugs to Ycells LLC's email address at info@ycells.com. This order requested Anastrozole, Tamoxifen, Letrozole, Clenbuterol, T3, YK 11, Ostarine, MK-677, LGD 4033 and GAC Injection, all of which are drugs commonly used for body building or to counteract the effects of steroid use. The purchase was paid for using an undercover credit card. The total cost of the purchase was $4,500.00 for product and $60.00 for shipping. The

product was again to be shipped to an undercover P.O. Box in Winchester, VA.  Again a confirmation email was received from "Wendy" from the email address info@ycells.com on October 23, 2018.

40.     On October 30, 2018, Special Agent Flagg received three boxes shipped from Ycells LLC to the undercover P.O. Box in Winchester, VA.  Special Agent Flagg shipped the packages unopened to me, and I collected the contents as evidence on November 1, 2018.  There were three boxes addressed from Ycells LLC, 54 Cummings Park, Suite 320, Woburn, MA 01801.  Each box contained smaller boxes, each of which was labeled "For Research Use Only" and "Not for Human Consumption."  The boxes contained twenty-five vials labelled GAC Glutamine 25mg/ml, twenty-five vials labelled Arginine 100mg/ml, twenty-five vials labelled Carnitine 250mg/ml, fifty vials labelled Clenbuterol 30ml, fifty vials labelled Anastrozole 30ml, twenty-five vials labelled MK-677 30ml, twenty-five vials labelled LGD-4033 30ml, twenty-five vials labelled MK-2866 30ml, fifty vials labelled YK-11 30ml, fifty vials labelled T3/Triiodothyronine 30ml, fifty vials labelled Tamoxifen 30ml, and fifty vials labelled Letrozole 30ml.  The package did not contain labeling with directions for use for any of the drugs.

41.     I determined that this package had been shipped from a UPS store located in Watertown, MA on October 26, 2018.

***Evidence Showing That Ycells is Aware That Its Products Are Sold for Human Consumption***

42.     On November 20, 2018, I sent an email to info@ycells.com stating: *"Hello Wendy, We have received numerous complaints from our customers in the past few weeks about symptoms of nausea, vomiting, dizziness, and even diarrhea with the recent purchase of SARMS and other research liquids.  They are also complaining of the strong alcoholic/chemical taste*

*that burns when taking the liquids."* The email further inquired whether the products had been made in a sterile environment and in the U.S. as advertised.

43.    On November 21, 2018, we received an email from "Wendy" utilizing the info@ycells.com address that stated, *"I am so sorry to hear that you got complaints about our products.  Actually it is really rare for us to get complaints on chemical liquids. Especially for side effects, we never got this kind of feedback. Furthermore, your items were prepared with other orders from other customers at the same time, but we don't hear any bad report yet if there is anything wrong.  For alcoholic/chemical taste, we have to use alcohol to solve most of them, I believe that's the standard procedure, we really cannot make better on that. The only thing I can assure you is that we prepare our product in a sterile environment and always prepared fresh in the USA. The quality of chemicals and our handling processes are rigorous. I agree with you that the quality, the reputation is key to business, we never compromise on that."*

44.    I searched FDA resources and found no applications for new drugs have been submitted by Ycells LLC, nor is Ycells LLC registered through the FDA.  Furthermore, based on my training and experience, products intended for research and development are generally packaged in bulk and not divided into small quantities.

***Third Undercover Purchase of Illicit Drugs***

45.    On October 7, 2019, I sent an email to the email address info@ycells.com requesting a quote to purchase GAC Injection, Clenbuterol, Tamoxifen, Ostarine, Anastrozole, Tadalafil and Sildenafil, all of which are drugs commonly used for body building or to counteract the negative effects of steroid use.  None of these drugs are approved by the FDA for these intended uses.  In addition, I inquired as to the availability and prices for the drugs Tianeptine and Phenibut.  Tianeptine and Phenibut belong to a class of drugs referred to as nootropics, which are commonly used to enhance mood or cognitive function.

46.     Later the same day, October 7, 2019, I received an email response from info@ycells.com.  That email stated: "*Hi Eric, Nice to hear from you! In the attachment please see the quote, let me know if you have any question. We can get them ready in two days if you are OK to proceed. Currently we don't have those two items you asked. I will talk with my partner and let you know in couple days.*"  The attached written quote for the purchase of GAC Injection, Clenbuterol, Tamoxifen, Ostarine, Anastrozole, Tadalafil and Sildenafil totaled $2,185.00, including $40.00 for shipping.

47.     I responded to the email that day stating that I would wait to place the order until "Wendy" could determine the availability of the Tianeptine and Phenibut.

48.     On October 8, 2019, I received an email from the info@ycells.com email address stating that "*We should be able to get Tia and Phen in about 2-4 weeks. For Tia, it's $6,000/kg and $750/100g. For Phen it's $350kg. Let me know if you are interested.*"  From my training and experience I understand that "Tia" is shorthand for Tianeptine and "Phen" is shorthand for Phenibut.

49.     On October 15, 2019, I sent an email to info@ycells.com via our undercover email address asking if the order could be processed for delivery no later than the upcoming Friday (October 18, 2019).  Later this same day, I received an email from info@ycells.com "*For the order, we can make it delivieried (sic) this Friday. Is your credit card x5396 still valid? We will charge it once the shipment is out.*"  I responded to info@ycells.com from our undercover email address that the credit card was valid and requested the order be processed.  In that same email, I wrote "*We having been getting a lot of requests for tia, and I expect it will only go up. Could you do a little better on the price?  If we can work something out we would start with a kg in 10gram packs.*"

50.     On October 16, 2019 at around 5:15 pm, I, along with other agents, conducted surveillance at the ███████████ .  Shortly after 6 pm, GONG was observed arriving at that address driving a black Honda CRV.  The Honda CRV was registered to him and bore license plate number 9JBM40.  GONG parked in the driveway at that property and entered the residence.  Shortly thereafter, a government agent observed GONG place several packages into the rear of the Honda CRV.  GONG then departed the ███████████ and drove directly to a UPS Store located at 15 Main Street, Watertown, MA.

51.     Upon his arrival at the UPS Store, I observed GONG remove three packages from the rear of the Honda CRV and bring them into the UPS Store, completing the task in two trips.  Following GONG's departure, I made contact with the UPS Store manager who pointed to the packages GONG had dropped off.  I identified and photographed each of the three packages.  Two of the packages were addressed to the undercover identity and address used when placing the order for GAC Injection, Clenbuterol, Tamoxifen, Ostarine, Anastrozole, Tadalafil and Sildenafil.  The two packages addressed to the undercover address (as well as the third package dropped off by GONG) had a return address of Ycells LLC, 54 Cummings Park, Suite 320, Woburn, MA 01801.

52.     On October 19, 2019, Special Agent Flagg received two packages shipped by Ycells LLC to the undercover address in Winchester, VA. Special Agent Flagg shipped the packages to me unopened and I inventoried and collected the contents as evidence.  The two boxes contained a total of ten smaller boxes, each of which were labeled "For Research Use Only" and "Not for Human Consumption."  The vials had the following labels: Clenbuterol, Tamoxifen, MK-2866, GAC, Anastrozole, Tadalafil and Sildenafil.  Testing conducted by the FCC determined the vials contained the drugs identified on the labels with the exception of the

sample labeled "GAC."  Based upon my training and experience, as well as discussions with other agents, I understand that GAC stands for Glutamine, Arginine, and Carnitine which are amino acids used by bodybuilders.  The FCC testing of the vials labeled GAC identified no active pharmaceutical ingredients.

***Fourth Undercover Purchase of Illicit Drugs***

53.     Contemporaneously with placing the order for Clenbuterol, Tamoxifen, MK-2866, GAC, Anastrozole, Tadalafil and Sildenafil, I continued to negotiate via email for the purchase of Tianeptine from Ycells.

54.     On October 16, 2019, I received an email from info@ycells.com in response to the email sent from the undercover address the previous day.  The email from info@ycells.com stated, *"So you want a whole kg packed separately in 100x 10gram packs? I will ask to see if it is possible in manufacture end, also a shipment with 100 packs inside is not a good sign at Customs."*

55.     I responded the following day, October 17, 2019, from the undercover email account.  My email stated *"I see the shipment was sent [referring to the shipment of Clenbuterol, Tamoxifen, MK-2866, GAC, Anastrozole, Tadalafil and Sildenafil], thank you Wendy.  10gram packs would be best, what would you recommend to help with the customs issue?"*

56.     On October 18, 2019, I received an email from the email address info@ycells.com.  The email stated, "*I talked with manufacture but they don't want to generate 100x 10gram packs at 1kg price. It takes quite effort and wear&tear to do that. Sorry about that.*"

57.     After further negotiation of the price for Tianeptine, I reached an agreement with Ycells to purchase Tianeptine for a price of $5,000 for the first kilogram and $4,000 for subsequent kilogram orders with the Tianeptine to be packaged in twenty 50 gram packages.

58.     On December 12, 2019, I transferred $5,000.00 from an undercover bank account to an account held in the name of Ycells LLC at TD Bank.  That same day, I sent an email from the undercover email address to info@ycells.com indicating that the bank transfer had been completed.

59.     Later that day, I received an email from info@ycells.com.  That email stated, *"Hi Eric, Thank you for the payment, it has been posted. We will send package to you tomorrow for Tuesday delivery. Best, Wendy[.]"*

60.     On December 19, 2019, Special Agent Flagg received one package from Ycells LLC at the undercover Winchester, VA address. Special Agent Flagg shipped the package unopened to this agent.  On December 20, 2019, I received the package, inventoried it and processed it into evidence. There was one box addressed from Ycells LLC, 54 Cummings Park, Suite 320, Woburn, MA 01801.  The box contained twenty (20) pink in color, ziplock style bags, each containing approximately 50grams of white powder suspected to be Tianeptine. One of the bags was labeled "Tianeptine, 20 x 50 gram, For Research Use Only, Not for Human Consumption."  UPS tracking information indicated this package was shipped from the UPS Store located at 15 Main Street, Watertown, MA 02472.  Testing conducted by the FCC identified the white powder as Tianeptine.

61.     Tianeptine is not an FDA-approved drug.  Tianeptine is approved in 25 countries in parts of Europe and Asia as a tricyclic antidepressant.  Tricyclic antidepressants are among the earliest antidepressants developed but have been replaced by antidepressants that cause fewer side effects and are generally used as a last resort if other drugs fail.  Tianeptine is also known to have opioid receptor activity. Its overuse is associated with the effects of prescription painkillers and opioids, including its propensity to induce withdrawal symptoms.  Tianeptine withdrawal is

characterized by high level of anxiety and excitability akin to withdrawal from opioids.  Online research for Tianeptine indicates that there are many sellers of Tianeptine to consumers in the United States.  Tianeptine is marketed as a cognitive enhancement product, commonly referred to as a "Nootropic."

***Further Seizures and Execution of Search Warrant at*** ███████████ ***in November 2020***

62.     On August 3, 2020, I received information from a Homeland Security Investigations ("HSI") Special Agent concerning the seizure of two packages addressed to Ycells.  One of the packages, seized by HSI on July 30, 2020, was addressed to Ycells at 464 Common Street, Suite 317, Belmont, MA 02478.  464 Common Street, Belmont, MA 02478 is the location of a UPS store.  The second package seized by HSI on July 31, 2020 was addressed to Ycells at 519 Somerville Ave, Suite 118, Somerville, MA 02143.  519 Somerville Ave, Suite 118, Somerville, MA 02143 is the location of a UPS store.

63.     The two packages contained a total of 3,200 vials with several different colored caps, containing an unknown white powder.  Samples of the vials have been sent to the FCC for analysis.

64.     On August 6, 2020, I received information from the same HSI Special Agent concerning the seizure of another package addressed to Ycells at 738 Main Street, Suite 227, Waltham, MA 02451.  This package contained a total of 1,300 vials with several different colored caps, containing an unknown white powder.  Samples of the vials have been sent to the FCC for analysis.

65.     On November 5, 2020, a grand jury returned an indictment charging TANG and GONG with one count of conspiracy, in violation of 18 U.S.C. § 371, and twenty-one counts of introducing misbranded drugs into interstate commerce with intent to defraud and mislead in violation of 21 U.S.C. §§ 331(a) and 333(a)(2).

66.     On November 9, 2020, this Court issued a search warrant for ████████ ,

Belmont, MA (20-MJ-6738-MPK).  I, along with other agents from the FDA and other agencies,

executed that warrant on November 10, 2020.  GONG and TANG were arrested that same day

during the execution of the search warrant.

67.     During that search, I and other agents seized dozens of bottles, jugs, and other

containers containing liquid and powder chemicals or chemical residues.  The labels on the

containers included, among other drug names, Clenbuterol, Sildenafil, Tadalafil, Tamoxifen,

MK-677, MK-2866, LGD-4033, GW-501516, and Anastrozole.

***Evidence Obtained Through the March 2019 Search Warrant Issued for the Target Account***

68.     As described above (*supra* ¶ 5), the Court issued a search warrant for data and

records related to the Target Account on March 25, 2019.  Execution of that warrant identified a

number of emails and other records that are evidence of the Subject Offenses.  The evidence

obtained through the March 2019 search warrant includes, but is not limited to:

a.  Evidence that GONG and TANG operated the info@ycells.com email account.

This evidence includes correspondence and records such as hotel and travel

reservations booked under the names Chenguang GONG and Yalan TANG and

emails signed with the names "Yalan" and "Chenguang";

b.  Evidence of the sale of drugs by Ycells to its customers, including invoices,

purchase orders, and other correspondence.  These records include evidence that

the operator of the Ycells account was aware that these purchases were intended

for human use.  As one example, a Ycells customer asked if "T3" (an abbreviation

for Triiodothyronine, a hormone commonly used by bodybuilders) has "a burning

flavor?  Like it's straight alcohol?"  This customer received a response from

info@ycells.com stating that "[a]ccording to the standard preparation protocol,

the liquid contains alcohol, water and glycerol.  If you don't like the buring [sic] flavor from the alcohol, we can decrease the concentration of the alcohol somehow."  In other emails, customers refer to drugs by their brand names—Viagra and Cialis—rather than by the chemical names Sildenafil and Tadafil or by other terms clearly indicative of human use, such as requesting the "Super Titan Blend" or a "Stack" of multiple drugs used in bodybuilding;

c.  Evidence concerning the purchase and import by Ycells of Selective Androgen Receptor Modulators ("SARMS"), which are commonly used as performance enhancers for bodybuilding, peptides, hormones, and other drugs from foreign manufacturers.  These documents include invoices showing the purchase by Ycells of drugs, including Sildenafil, Tadafil, peptides, hormones and SARMS, and other correspondence with representatives of these foreign manufacturers;

d.  Evidence concerning the shipment of these products to addresses associated with Ycells and/or TANG and GONG.  As one example, on February 24, 2017, an email was sent from the info@ycells.com email address to the email address michael@tcsindustry.com.  TCS industry was a China-based manufacturer of chemicals, including peptides and other drugs.  The body of the email included the following names and addresses:

  i.   Ycells  Joe S., 1337 Massachusetts Ave. STE. 272, Arlington, MA 02476

  ii.  Syngenes, Heidi H., ████████████, Belmont, MA 02478

  iii. YCELLS LLC, Iris Z., 738 Main St. STE 227, Waltham, MA 02451

  iv.  Sel Grit, Mr. Gong, 1770 Massachusetts Ave. STE 599, Cambridge, MA 02140

v.   SLLECY, Pryanka N., 464 Common St. STE 317, Belmont, MA 02478

vi.  SLLECY, Vicky Sanger, 15 Main St. STE 292, Watertown, MA 02472

As noted above, ██████████, Belmont, MA is a former residential

address of TANG.  The remainder of these addresses are UPS mailboxes rented

by TANG or GONG.  These addresses also include the same addresses as the

intended recipients of the seized packages described above in Paragraphs 16-23;

and

e.  Evidence showing that equipment and supplies that can be used in the

manufacture and packaging of drugs, such as glycerine and propylene glycol

(commonly used in the preparation of steroids, steroid-like products, and other

drugs as a solvent), vials, droppers, and packaging material, were ordered and

shipped to GONG and TANG's residential address.

69.     On November 24, 2020, the United States Attorney's Office for the District of

Massachusetts sent a letter to Endurance requesting, under 18 U.S.C. § 2703(f), that Endurance

preserve records associated with the Target Account for 90 days.

**TECHNICAL BACKGROUND**

70.     In my training and experience, as well as through discussions with other agents, I

have learned that e-mail hosting companies, such as Endurance, maintain computer servers

connected to the Internet.  Their customers use computers to send e-mail via the Internet.

Customers can access their accounts on the company's e-mail servers from any computer

connected to the Internet.

71.     When an e-mail user sends an e-mail, it is initiated at the user's computer,

transferred via the Internet to the computer servers of the user's e-mail provider, and then

transmitted to its end destination.  Conversely, an e-mail sent to an e-mail recipient resides on the

computer servers of the recipient's e-mail provider until it is transferred by the recipient to his computer to be read.

72.     I know from previous investigation-related conversations with e-mail service providers that customers can keep unread, sent, and draft e-mails in their account indefinitely, as long as they are not deleted by the user.  In addition, e-mail service providers often have storage capacity that allows customers to store opened incoming mail and sent mail indefinitely if they choose, subject to a maximum size limit.

73.     E-mail providers also typically maintain electronic records relating to their customers.  These records include account application information, account access information, and e-mail transaction information.

74.     Many e-mail providers can also provide the following additional information associated with a subscriber's account: address books; buddy lists; photos, files, data, World-Wide Web profiles or homepages.

## LEGAL AUTHORITY

75.     The government may obtain both electronic communications and subscriber information from an e mail provider by obtaining a search warrant.  18 U.S.C. §§ 2703(a), 2703(c)(1)(A).

76.     Any court with jurisdiction over the offense under investigation may issue a search warrant under 18 U.S.C. § 2703(a), regardless of the location of the website hosting company or e mail provider whose information will be searched.  18 U.S.C. § 2703(b)(1)(A). Furthermore, unlike other search warrants, § 2703 warrants do not require an officer to be present for service or execution of the search warrant.  18 U.S.C. § 2703(g).

77.     If the government obtains a search warrant, there is no requirement that either the government or the provider give notice to the subscriber.   18 U.S.C. §§ 2703(b)(1)(A), 2703(c)(3).

78.     This application seeks a warrant to search all responsive records and information under the control of Endurance, a provider subject to the jurisdiction of this court, regardless of where Endurance has chosen to store such information.  Pursuant to 18 U.S.C. § 2713, the government intends to require the disclosure pursuant to the requested warrant of the contents of wire or electronic communications and any records or other information pertaining to the customers or subscribers if such communication, record, or other information is within Endurance's possession, custody, or control, regardless of whether such communication, record, or other information is stored, held, or maintained outside the United States.

**FOURTEEN-DAY RULE FOR EXECUTION OF WARRANT**

79.     Federal Rule of Criminal Procedure 41(e)(2)(A),(B) directs the United States to execute a search warrant for electronic evidence within 14 days of the warrant's issuance.  If the Court issues this warrant, the United States will execute it not by entering the premises of Endurance, as with a conventional warrant, but rather by serving a copy of the warrant on the company and awaiting its production of the requested data.  This practice is approved in 18 U.S.C. § 2703(g),[2] and it is generally a prudent one because it minimizes the government's intrusion onto Internet companies' physical premises and the resulting disruption of their business practices.

---

[2] Section 2703(g) provides that "[n]otwithstanding section 3105 of this title, the presence of an officer shall not be required for service or execution of a search warrant issued in accordance with this chapter requiring disclosure by a provider of electronic communications service or remote computing service of the contents of communications or records or other information pertaining to a subscriber to or customer of such service."

80.     Based on my training and experience and that of other law enforcement, I understand that e-mail providers sometimes produce data in response to a search warrant outside the 14-day period set forth in Rule 41 for execution of a warrant.  I also understand that e-mail providers sometimes produce data that was created or received after this 14-day deadline ("late-created data").

81.     The United States does not ask for this extra data or participate in its production.

82.     Should Endurance produce late-created data in response to this warrant, I request permission to view all late-created data that was created by Endurance, including subscriber, IP address, logging, and other transactional data, without further order of the Court.  This information could also be obtained by grand jury subpoena or an order under 18 U.S.C. § 2703(d), neither of which contains a 14-day time limit.  However, law enforcement personnel will seek to avoid reviewing any late-created data that was created by or received by the account-holder(s), such as e-mail, absent a follow-up warrant.

83.     For these reasons, I request that the Court approve the procedures in Attachment B, which set forth these limitations.

//

//

//

//

//

//

//

//

//

**CONCLUSION**

84.    Based on the information described above, I have probable cause to believe that

records and data from the target accounts (as described in Attachment A), contain evidence,

fruits, and instrumentalities of the Subject Offenses (as described in Attachment B).

85.    The procedures for copying and reviewing the relevant records are set out in

Attachment B to the search warrant.

/s/ William Hughes
_____
William Hughes
Special Agent
FDA-OCI

Subscribed and sworn to telephonically on February __8__ 2021,

Chief United States Magistrate Judge

